**WRC NORTH FORK HEIGHTS, INC., Appellant**

v.

**BOARD OF ASSESSMENT APPEALS, JEFFERSON COUNTY, Pennsylvania.**

Commonwealth Court of Pennsylvania.

Argued Oct. 18, 2006.

Decided Feb. 20, 2007.

David C. Marshall, Mechanicsburg, for appellant.

John C. Dennison, II, Brookville, for appellee.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge SMITH–RIBNER.

The Court of Common Pleas of Jefferson County upheld the denial by the Board

of Assessment Appeals of Jefferson County (Board of Appeals) of the request for real estate tax exemption sought by WRC North Fork Heights, Inc. (WRC). The following questions are presented in this appeal: (1) whether the trial court erred by requiring WRC first to satisfy the judicial test for exemption delineated in *Hospital Utilization Project v. Commonwealth*, 507 Pa. 1, 487 A.2d 1306 (1985) (*HUP*), rather than deciding only whether WRC satisfied the specific statutory test for exemption as a federally subsidized housing provider under Section 204(a)(3) of The General County Assessment Law (Assessment Law), Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020–204(a)(3); (2) if not, whether the trial court erred by requiring WRC to show that it satisfied the judicial test in *HUP* and its progeny rather than criteria in the Institutions of Purely Public Charity Act (Charity Act), Act of November 26, 1997, P.L. 508, 10 P.S. §§ 371–385; and (3) whether it erred in concluding that WRC did not satisfy the *HUP* test.

I

WRC operates a fifty-six-unit, low-income housing facility for the elderly known as North Fork Heights in Brookville. WRC appealed its assessment to the Board of Appeals asserting entitlement to exemption under Section 204(a)(3) of the Assessment Law, which the Board of Appeals denied. Before trial on WRC's appeal to the trial court, the parties stipulated that WRC participates in the United States Department of Housing and Urban Development (HUD) Section 202 Program of Housing for the Elderly or Handicapped under the Housing Act of 1959, 12 U.S.C. § 1701q, *as amended* (Section 202 Program). The Section 202 Program provides a capital advance to finance construction of a housing project and periodic operating subsidies to fill the gap between the cost of

elderly housing and the rent that low-income residents can afford, with the capital advance functioning as an interest-free loan on which no payments are due so long as the housing meets program requirements for the next forty years. Under the program 100 percent of WRC's units must be occupied by elderly or handicapped persons who qualify for and receive federal subsidies, and the units are so occupied.

WRC is continually monitored by HUD to assure compliance with program requirements, and every month WRC submits a Housing Owner's Certification & Application for Housing Assistance Payments to HUD. WRC's articles of incorporation prevent any net earnings from inuring to the benefit of or being distributed to any of its members, officers, directors or other individuals. Frances Coons, President and CEO of WRC's parent company WRC Senior Services, testified that WRC helps residents access medical, social, emotional and spiritual services necessary to meet their needs.

The trial court noted that the Pennsylvania Constitution establishes the framework for entitlement to real estate tax exemption. Article VIII, Section 2 of the Constitution provides in part as follows: "(a) The General Assembly may by law exempt from taxation: ... (v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution." The trial court also quoted the amendment to Section 204(a)(3) of the Assessment Law, which was added by Section 1 of the Act of December 14, 1992, P.L. 886:

any charitable organization providing residential housing services in which the charitable nonprofit organization receives subsidies for at least ninety-five

per centum of the residential housing units from a low-income Federal housing program shall remain a "purely public charity" and tax exempt provided that any surplus from such assistance or subsidy is monitored by the appropriate governmental agency and used solely to advance common charitable purposes within the charitable organization. . . .

WRC claimed that it met the requirements of Section 204(a)(3) and that it therefore was automatically deemed to be a "purely public charity" and did not have to satisfy the five-prong test for exemption under the Charity Act.

■ The trial court cited the decision rendered by the Supreme Court in *Community Options, Inc. v. Board of Property Assessment, Appeals and Review,* 571 Pa. 672, 813 A.2d 680 (2002), for the proposition that the question of whether an entity is a "purely public charity" under the Constitution is a question that must be addressed before the question of whether it meets statutory qualifications for exemption. The five-prong test for determining whether an entity is exempt under Article VIII, Section 2(a)(v) as a purely public charity was provided in *HUP* as follows:

> [A]n entity qualifies as a purely public charity if it possesses the following characteristics.
>
> (a) Advances a charitable purpose;
>
> (b) Donates or renders gratuitously a substantial portion of its services;
>
> (c) Benefits a substantial and indefinite class of persons who are legitimate subjects of charity;
>
> (d) Relieves the government of some of its burden; and

(e) Operates entirely free from private profit motive.

*HUP,* 507 Pa. at 21–22, 487 A.2d at 1317.

■ The Board of Appeals contended that WRC did not meet the second and fourth prongs of the *HUP* test. The trial court concluded that the evidence did not show that WRC donates or renders gratuitously a substantial portion of its services; rather, all of the residents pay rent that is then subsidized by the federal government. Furthermore, WRC was not abating government costs and did not meet the fourth prong as well. As to the fourth prong, this Court had stated: " 'Tax exempt status is properly reserved for organizations which abate government costs, not for those who perform government responsibilities as independent contractors.' " *Community Options, Inc. v. Board of Property Assessment, Appeals and Review,* 764 A.2d 645, 650–651 (Pa.Cmwlth.2000) (quoting *Community Service Found., Inc. v. Bucks County Board of Assessment and Revision of Taxes,* 672 A.2d 373, 376 (Pa.Cmwlth. 1996)), *rev'd in part,* 571 Pa. 672, 813 A.2d 680 (2002). Accordingly, the trial court ordered that WRC was not entitled to tax exemption.[1]

## II

WRC first contends that the trial court misapplied the test for entitlement to real estate tax exemption for federally subsidized housing providers by effectively and improperly declaring the statutory test contained in the 1992 amendment to Section 204(a)(3) of the Assessment Law to be unconstitutional. WRC asserts that it is a charitable organization, and its Articles of Incorporation state that it is organized exclusively for charitable and educational

1. This Court's review of a trial court's order in a real estate tax exemption appeal is limited to determining whether the trial court abused its discretion, committed an error of law or made findings unsupported by substantial evidence. *In re RHA PA Nursing Homes,* 747 A.2d 1257 (Pa.Cmwlth.2000).

purposes, with power to provide elderly and handicapped persons with housing facilities and services to meet their social and emotional needs. The parties stipulated that all of WRC's units are occupied by individuals receiving federal subsidies, and WRC introduced confirming Certification Forms for 2004; thus the requirement under Section 204(a)(3) that ninety-five percent receive federal subsidies is met. They also stipulated that HUD continually monitors WRC for its Program compliance. Finally, Susan Schmader, Director of Finance for WRC Senior Services, testified that any surplus that WRC might experience would be rolled back into the organization or, if at certain levels, would be subject to HUD disposition.

WRC argues that the legislature is authorized by the Constitution to exempt federally subsidized housing from real estate taxation. Implicit in the Article VIII, Section 2(a) authority for the legislature to exempt institutions of "purely public charity" is the ability of the legislature to define that term. WRC cites *School Districts of Deer Lakes and Allegheny Valley v. Kane*, 463 Pa. 554, 345 A.2d 658 (1975), for the proposition that interpretive language placed on the Constitution by the legislature in the course of enactment of statutes is entitled to great weight. In *Heller v. Depuy*, 2 Pa.Cmwlth. 196, 277 A.2d 849 (1971), this Court held that the legislature had the authority to define "public utilities" in Article VIII, Section 4, which it did in a former act relating to public utility realty tax; the addition to the usual definition was seen as binding upon all, including the courts. In addition, the Supreme Court has recognized that "[t]he constitution does not, of itself, exempt any property; it merely permits the legislature to do so within certain limits." *Donohugh's Appeal*, 86 Pa. 306, 309 (1878). There is a presumption that the legislature does not intend to violate the Constitution. Section

1922(3) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(3). According to WRC, to disregard the test under Section 204(a)(3) of the Assessment Law would be a de facto determination that the 1992 amendment was unconstitutional.

WRC urges the Court to accept its view that the enactment of the 1992 amendment to Section 204(a)(3) of the Assessment Law overruled all case law requiring federally subsidized housing providers to meet a "judicial test," i.e., the *HUP* test, for exemption. In *Four Freedoms House of Philadelphia, Inc. v. City of Philadelphia*, 443 Pa. 215, 279 A.2d 155 (1971), the Supreme Court concluded that a nonprofit corporation created by labor unions to provide low-cost housing for the elderly, which constructed a facility with 100 percent financing from Section 202 of the Housing Act of 1959, with age and income criteria and rents less than commercial rates, with officers and directors serving without pay and with no power to accumulate a profit, was entitled to exemption. In 1985 the Supreme Court established the *"HUP* test."

In 1987 the Supreme Court decided *G.D.L. Plaza Corp. v. Council Rock School District*, 515 Pa. 54, 526 A.2d 1173 (1987). The facility at issue, financed through the Section 202 Program, provided residential housing to persons at least sixty-two years of age, with limited incomes and assets. The facility received monthly housing payments from the federal government to make up the difference between costs and rent. This Court had applied the *HUP* test and concluded that the facility met the first, third and fifth prongs but that it did not meet the second and fourth. The Supreme Court on appeal stated that this Court may have erred in overlooking findings as to the extent of services provided and overestimating the degree to which an institution must relieve the government of

some of its burden. It distinguished *Four Freedoms House* because there the mortgage repayment was accomplished solely through payments of rents at less than market rates. In *G.D.L. Plaza* the Supreme Court noted that Section 204(a)(3) of the Assessment Law requires an entity to be "founded, endowed, and maintained" by public or private charity. In that case, all operating costs not covered by rents paid by tenants were borne by federal government subsidies. The Section 202 mortgage loan program and the housing program pursuant to Section 8 of the Housing Act of 1937, *as amended,* 42 U.S.C. § 1437f, were perceived as a design to encourage nonprofit corporations to undertake the work of increasing housing supply without assuming financial risk. Exemption was denied.

WRC emphasizes that the cases above were decided before the 1992 amendment to Section 204(a)(3) of the Assessment Law. WRC asserts that the legislature for many years failed to define "purely public charity" and that the courts filled the void, as in the *HUP* case. Although acknowledging that the Supreme Court has ultimate authority to interpret the Pennsylvania Constitution, WRC also states that the Supreme Court has recognized that Article VIII, Section 2 is not self-executing but requires legislative standards for implementing tax exemptions. WRC's central contention is that through the 1992 amendment to Section 204(a)(3) the legislature exercised its constitutional power and chose to codify real estate tax exemption law and to provide a definition of "purely public charity" in the context of federally subsidized housing providers. WRC submits that the courts' role is limited to determining whether the statute was passed pursuant to constitutionally delegated authority and consistent with constitutional requirements for valid legislation. Alternatively, if a five-part test must be

applied, it should be that set forth in the Charity Act, adopted in 1997 as an exercise of the legislature's constitutional authority. The Act approved the categories outlined in the *HUP* test and is in many ways a codification of it, although the Act provides more objective and measurable criteria to evaluate satisfaction of the five elements.

Finally, WRC maintains that the trial court erred in concluding that it does not meet the five-part test for exemption as a purely public charity. WRC contends that whether it donates or renders gratuitously a substantial portion of its services should have been evaluated under the Charity Act. Section 5(d)(1)(iv), 10 P.S. § 375(d)(1)(iv), specifies:

> Financial assistance or uncompensated goods or services to at least 20% of those receiving similar goods or services from the institution if at least 10% of the individuals receiving goods or services from the institution either paid no fees or fees which were 90% or less of the cost of the goods or services provided to them, after consideration of any financial assistance provided to them by the institution.

Section 5(d)(1)(v), 10 P.S. § 375(d)(1)(v), specifies "Uncompensated goods or services which in the aggregate are equal to at least 5% of the institution's costs of providing goods or services." WRC argues that the evidence shows that all residents pay fees less than WRC's cost to operate, so more than twenty percent pay fees that are ninety percent or less of the cost to WRC. Also, the total of rents plus federal subsidies, it asserts, is ninety percent or less of the institution's costs. Its IRS form for fiscal year 2002–2003 showed total revenues of $291,231 and total expenses of $405,271. The difference of $114,040 is uncompensated goods or services, although the Board of Appeals

points out that WRC claimed $121,673 in depreciation for that year for a positive net cash flow of $7633.

There is no dispute that WRC benefits a substantial and indefinite class of persons who are legitimate subjects of charity. WRC states that it relieves government of some of its burden by providing housing that the government would have to provide, directly or indirectly or by assuring that a similar institution exists, *see* Section 5(f)(1), 10 P.S. § 375(f)(1), and it receives, on a regular basis, payments from the federal government for housing services that are less than the full costs for providing those services. *See* Section 5(f)(3), 10 P.S. § 375(f)(3); *Lutheran Home at Topton v. Schuylkill County Board of Assessment Appeals*, 782 A.2d 1 (Pa.Cmwlth. 2001) (stating that a facility which subsidized rents of some residents and maintained a policy of keeping residents on after their assets ran out relieved government of some of its burden). WRC operates free from profit motive.

The Board of Appeals responds that the trial court properly applied the five-prong *HUP* test in determining that WRC was not entitled to exemption. The Board argues that the second prong was not met as the evidence at trial shows that residents pay rent, and the difference between that and fair market value is then paid to WRC by a subsidy through the Section 202 Program. The only other testimony was that WRC helps residents access services for their medical, social and emotional needs, with no testimony as to the extent of such help or even if it is provided without charge. Regarding the fourth prong, the Board of Appeals cites *G.D.L. Plaza Corp.*, where the entire funding of the project was derived from rents paid by residents and federal government subsidies, and it states that in *Community Options, Inc.* the Supreme Court ruled that the amount of charitable contributions that are made to an entity seeking tax exemption is "crucial" in the analysis of whether it relieves government of some of its burden, and the evidence here shows that WRC receives no charitable contributions.

The Board of Appeals disputes WRC's contention that it is exempt from real estate taxes simply because it meets requirements of Section 204(a)(3) of the Assessment Law. This Court held in its decision in *Community Options, Inc.* that an entity seeking tax exemption must first be measured by the constitutional language before the question of whether it meets a statutory exemption may be reached, which was reaffirmed unequivocally by the Supreme Court.

Regarding WRC's assertion that the trial court should have applied the test from the Charity Act, the Board of Appeals contends that this issue is waived because WRC did not present it to the trial court, which noted WRC's claim that it was not required to satisfy the test under that Act. Issues not raised in the trial court are waived and cannot be raised for the first time on appeal. Pa. R.A.P. 302(a). Nevertheless, the Supreme Court's decision in *Community Options, Inc.* applied the *HUP* test to determine an exemption issue well after the Charity Act became effective. If the issue is not waived, the Board argues that WRC did not meet the statutory tests it cited because they require proof of the costs of goods or services rendered, and WRC offered no proof of its costs in assisting residents to access services.[2]

**2.** National Church Residences of Mercer County, PA, appellant in the case docketed at No. 102 C.D. 2006 and listed for argument at a later time, filed a Motion for the Court to Take Notice of Related Appeal, representing that its case involves virtually identical issues and requesting that the Court take notice of its appeal and the briefs filed therein. The

## III

■ The Court first addresses the contention of WRC that the trial court erred by requiring it to meet the *HUP* test before any statutory test, including that in Section 204(a)(3) of the Assessment Law, may be considered. The Supreme Court has been entirely consistent on this issue. In *Community Options, Inc.,* the trial court held that the institution would not qualify for an exemption under the *HUP* test for 1996 and 1997, but it would qualify under the Charity Act for 1998 and later years. The Supreme Court pointedly held: "An entity seeking a statutory exemption for taxation must first establish that it is a 'purely public charity' under Article VIII, Section 2 of the Pennsylvania Constitution before the question of whether that entity meets the qualifications of a statutory ex-

Court granted the motion by order of October 5, 2006 and has reviewed the briefs filed in that appeal as well.

NCR Mercer represented that the facts in its case are similar in that it owns and operates a federally subsidized housing development pursuant to Sections 202 and 8 of the Federal Housing Act, known as Buchanan Manor, and the strictly regulated nature of housing pursuant to these programs results in their looking, and acting, virtually the same. NCR Mercer raises similar arguments to those of WRC. It asserts that the constitutional analysis employed by the trial court in that case to reject the claim for real estate tax exemption (the trial court relied primarily upon *G.D.L. Plaza*) is contrary to the 1992 amendment to Section 204(a)(3) of the Assessment Law and provisions of the Charity Act.

NCR Mercer contends that the trial court erred when it concluded that NCR Mercer does not donate or render gratuitously a substantial portion of its services. In this regard NCR Mercer notes that earlier cases had established that services need not be provided entirely free of charge, and *HUP* itself stated that there was no magical percentage to determine if an amount donated was "substantial"; rather, "[i]t must appear from the facts that the organization makes a bona fide effort to service primarily those who cannot afford the usual fee." *HUP*, 507 Pa. at 19 n9, 487 A.2d at 1315 n9. NCR Mercer maintains that it meets the donation criterion because it makes such a bona fide effort, and its residents pay less than twenty-five percent of actual costs. Appellees Mercer County Board of Assessment Appeals and Mercer County note that NCR Mercer's own evidence demonstrated that it is the federal government that is subsidizing the residents, with NCR Mercer serving only as a conduit.

NCR Mercer further argues that the trial court erred in concluding that it does not relieve government of some of its burden. NCR Mercer notes that government historically has provided housing for the elderly. Further, it is obligated to provide safe, affordable housing to the poor, elderly and handicapped, under statements of policy in statutes such as Section 2 of the Housing Authorities Law, Act of May 28, 1937, P.L. 955, *as amended*, 35 P.S. § 1542 (noting the acute shortage of decent, safe and sanitary housing and providing for the creation of housing authorities). NCR Mercer was organized to provide housing for low-income elderly residents and suggests that if Buchanan Manor did not exist, the Commonwealth would have to "pick up the slack" for the housing itself. In *G.D.L. Plaza,* the Supreme Court stated that by undertaking the construction and day-to-day management of the complex and directly serving the needs of its residents, G.D.L. obviated the need for the government to do so. Separately, NCR Mercer argues that the trial court erred by failing to apply the presumption adopted in Section 6 of the Charity Act, 10 P.S. § 376, that a purely public charity possessing an exemption from sales and use tax complies with the criteria set forth in Section 5. The Pennsylvania Department of Revenue consistently has granted NCR Mercer exemption from sales and use taxes, and the trial court should have applied a presumption in its favor.

Appellees argue that the trial court correctly relied upon *G.D.L. Plaza* because there, as here, all of the facility's operating costs were covered by the federal subsidy, including real estate taxes. Amicus County Commissioners Ass'n of Pennsylvania stresses the finding of the trial court that NCR Mercer operates on a "zero-based" budget, which anticipates that annual revenues will equal annual expenditures and that HUD requires NCR Mercer to submit a budget forecasting expenses including anticipated real estate taxes.

emption can be reached." *Community Options, Inc.,* 571 Pa. at 676, 813 A.2d at 683 (citing *G.D.L. Plaza; HUP*). The Supreme Court first concluded that the entity involved there qualified as a "purely public charity" under *HUP*, and then it considered whether it met the requirements of the Charity Act.

The Supreme Court has never endorsed disregarding the constitutional analysis under *HUP* and proceeding solely under a statute to determine whether an entity seeking tax exemption is a "purely public charity," and this Court may not endorse such an approach here whether under Section 204(a)(3) of the Assessment Law or under the Charity Act. In *School Districts of Deer Lakes and Allegheny Valley* the Supreme Court reiterated that a legislative interpretation of the Constitution is entitled to great weight but that it cannot be conclusive upon the courts in deciding cases because judges no less than legislators are sworn to uphold the fundamental law. Cases such as *Heller* and *Ray v. Commonwealth,* 442 Pa. 606, 276 A.2d 509 (1971), do not involve legislative interpretations of constitutional terms definitively interpreted by the High Court.

▉▉▉▉ Upon its review of the record, the Court agrees with the Board of Appeals that WRC waived its contentions regarding compliance with requirements of the Charity Act because it did not present

them to the trial court. Nonetheless, WRC's vague testimony that it assists residents in accessing help with medical, social, emotional and spiritual needs, with no attempt to quantify the costs incurred by WRC, could not meet the specific requirements regarding donations stated in that Act. In terms of the *HUP* analysis, the record lacks evidence that WRC donates or renders gratuitously a "substantial portion" of its services.

As to the fourth prong of the *HUP* test, the Court is convinced that WRC's facility is not like that in *Four Freedoms House,* where rents lower than market rate were charged and the entity did not rely on government subsidies to make up the difference. Further, in *Community Options, Inc.,* where a private entity established group homes for mentally retarded persons, the Supreme Court stated that, although operational funding was largely provided by the government, the acquisition and renovation of housing for occupancy by persons with severe disabilities in residential neighborhoods was done without government funding. Government would have to add real estate, staff and training to accommodate these residents, and in fact the entity provided services that the government was not capable of providing. No similar circumstances exist in regard to WRC as simply a Section 202 Program housing provider.[3]

---

**3.** The dissenting opinion relies heavily on the Supreme Court's conclusion that the entity in *G.D.L. Plaza* met the *HUP* test. The dissent acknowledges, however, that *G.D.L. Plaza* is difficult to parse because the Supreme Court first determined that the entity was a "purely public charity" under the *HUP* test but then denied exemption for failure to satisfy the requirement of Section 204(a)(3) of the Assessment Law that it be "founded, endowed, and maintained by public or private charity." The more recent case of *Community Options, Inc.* is clearer.

As noted above, *Community Options, Inc.* plainly mandates that an entity must first establish that it is a "purely public charity" under Article VIII, Section 2 of the Constitution before the question of whether it meets the qualifications of a statutory exemption can be reached. At the end of *Community Options, Inc.* the Supreme Court referred to the municipality's argument on cross-appeal to this Court that because the entity did not meet the *HUP* test it was not necessary to consider whether it met the statutory definition, with which this Court agreed. Community Options argued to the Supreme Court

Based on clearly defined legal principles enunciated by the Supreme Court, this Court is compelled to conclude that the trial court did not err in its consideration of WRC's real estate tax exemption case. Accordingly, the Court affirms the order of the trial court.

## ORDER

AND NOW, this 20th day of February, 2007, the order of the Court of Common Pleas of Jefferson County is affirmed.

DISSENTING OPINION BY Judge LEAVITT.

Respectfully, I dissent. The majority's holding that WRC North Fork Heights, Inc. (WRC) failed to prove it was a purely public charity contravenes the binding precedent of *G.D.L. Plaza Corp. v. Council Rock School District*, 515 Pa. 54, 526 A.2d 1173 (1987) (*G.D.L. Plaza II*), wherein our Supreme Court held that a federally subsidized low-income housing provider, which was identical in all respects to WRC, was a purely public charity. *G.D.L. Plaza II* compels the same conclusion with respect to WRC's tax exemption request. In addition, the effect of the majority's holding is to nullify two acts of our General Assembly, which contravenes the Court's duty to

presume the constitutionality of our legislative enactments and to give them effect.

## Background

In 1994, WRC entered into a Capital Advance Agreement with the U.S. Department of Housing and Urban Development (HUD) for a $3 million loan that was used to construct North Fork Heights, a two story apartment building in Brookville, Pennsylvania.[1] All 56 of the one-bedroom apartments in North Fork Heights are occupied by persons who qualify for rent subsidies from HUD by reason of their low income. These subsidies make up the difference between WRC's costs and its rental revenue.

The availability of subsidies are governed by WRC's 20–year contract with HUD, which provides WRC a fixed amount of federal funds to support WRC's operations. The contract allows WRC to draw on these funds at a rate determined by its operational expenses. However, if WRC uses the contractually allocated funds too quickly, WRC cannot look to HUD for additional funds. Stated otherwise, the HUD Section 202 subsidies do not relieve WRC of all financial risk. In addition, WRC's eligibility for subsidies is subject to HUD's ongoing and thorough oversight.[2]

In 2004, Jefferson County notified WRC that it owed real estate taxes in the

---

that this Court ignored the definition of purely public charity in the Charity Act and did not give the legislature due deference. It is that argument that the Supreme Court decided it "need not reach" because the Supreme Court had rejected this Court's application of prior Commonwealth Court precedent to conclude that Community Options did not meet the *HUP* test. The Supreme Court's clear holding is that the *HUP* test does "trump" the Charity Act.

1. WRC does not need to repay the loan if the housing continues to be occupied by low-

income elderly and handicapped persons for 40 years.

2. This oversight includes, *inter alia*, the following: (1) a monthly certification of the current resident population at North Fork Heights, (2) an annual recertification to qualify as a participant in the Section 202 Program, (3) HUD's annual, or more frequent, survey to confirm Section 202 Program compliance, and (4) WRC's submission of an annual budget for HUD's review and approval.

amount of $34,498.40 for 2004.[3] Shortly thereafter, WRC requested a tax exemption from the Jefferson County Board of Assessment Appeals (Board). WRC asserted that as a federally funded low-income housing provider, it had an express exemption from real property taxation under Section 204(a)(3) of The General County Assessment Law, Act of May 22, 1933, P.L. 853, *as amended,* 72 P.S. § 5020–204(a)(3) (Assessment Law). The Board denied the exemption request.

WRC appealed, and a hearing was conducted by the trial court, which affirmed the Board.[4] The trial court reasoned that WRC was required, first, to demonstrate that it was a purely public charity within the meaning of the Pennsylvania Constitution and, if successful, then WRC had to show that it satisfied the terms for a Section 204(a)(3) exemption. Finding that WRC failed two of the five criteria established in *Hospital Utilization Project v. Commonwealth,* 507 Pa. 1, 487 A.2d 1306 (1985), the trial court concluded that WRC was not a purely public charity. Accordingly, the trial court did not consider whether WRC complied with the terms of Section 204(a)(3) of the Assessment Law.

The central issue in this appeal is by what standards should the tax exemption request of a federally subsidized provider of low-income housing, such as WRC, be judged. The answer requires a review of the authority relevant to any tax exemption request, which is found in our Pennsylvania Constitution, in enactments of the General Assembly and in our Supreme Court's precedent.

**Pennsylvania Constitution**

The Pennsylvania Constitution authorizes the General Assembly to exempt institutions of purely public charity from taxation in Article VIII, Section 2, which states as follows:

> (a) The General Assembly may by law exempt from taxation:
>
> \* \* \*
>
> (v) Institutions of purely public charity, but in the case of any real property tax exemptions only that portion of real property of such institution which is actually and regularly used for the purposes of the institution.

PA. CONST. art. VIII, 2(a)(v). The "constitution does not, of itself, exempt any property; it merely permits the legislature to do so within certain limits." *G.D.L. Plaza II,* 515 Pa. at 58, 526 A.2d at 1175 (1987) (quoting *Donohugh's Appeal,* 86 Pa. 306, 309 (1878)). The obverse is likewise true: the constitution does not obligate the legislature to provide any taxpayer with exemptions.

Exercising its authority under Article VIII, Section 2, the General Assembly has established tax exemptions for purely public charities in a number of tax statutes. For example, "charitable institutions" have been exempted from the payment of sales and use taxes,[5] and corporations holding a 501(c)(3) exemption from the Internal Rev-

---

**3.** As far as can be determined, this was the first time Jefferson County taxed WRC.

**4.** For the most part, the record consisted of stipulated facts and documents. WRC also presented the testimony of its President, Frances Robuck Coons, and of its Director of Finance, Susan McFadden Schmader. The Board presented no evidence in rebuttal.

**5.** Section 204 of the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, *as amended,* 72 P.S. § 7204, states as follows:

> The tax imposed by Section 202 [sales and use tax] shall not be imposed upon any of the following:
>
> \* \* \*

enue Code have been exempted from the payment of corporate net income taxes.[6] Regardless of what term is chosen by the legislature to identify the exempt taxpayer, *i.e.,* "charitable" or "501(c)(3) corporation," that statutory term will be treated as synonymous with "purely public charity" as used in Article VIII, Section 2 of the Constitution.[7]

The standards for identifying a "purely public charity" emerged in the case law over the course of many years. *See, e.g., Appeal of Woods Schools Tax Exemption Case,* 406 Pa. 579, 178 A.2d 600 (1962). These cases culminated in the landmark case, *Hospital Utilization Project,* which, drawing on years of precedent, announced a five-part test, the so-called *HUP* test, for determining whether an institution is a purely public charity. Under the *HUP* test, a purely public charity (a) advances a charitable purpose, (b) donates or renders gratuitously a substantial portion of its services, (c) benefits a substantial and indefinite class of persons who are legitimate subjects of charity, (d) relieves the government of some of its burden, and (e) operates entirely free from private profit motive. 507 Pa. at 22, 487 A.2d at 1317.

### The *G.D.L. Plaza* Litigation

Our Supreme Court held in *G.D.L. Plaza II* that a federally subsidized low-income housing provider was a "purely public charity" within the meaning of Article VIII, Section 2 of the Pennsylvania Constitution. This binding, but inconvenient, holding is disregarded by the majority.

G.D.L. Plaza's eligibility for a tax exemption was governed by an earlier version of Section 204(a)(3) of the Assessment Law that stated in relevant part as follows:

(a) The following property shall be exempt from all county, city, borough, town, township, road, poor and school tax, to wit:

* * *

(3) All hospitals, universities, colleges, seminaries, academies, associations and *institutions of* learning, benevolence, or *charity,* including fire and rescue stations, with the grounds thereto annexed and necessary for the occupancy and enjoyment of the same, *founded, endowed, and maintained by public or private charity:* Provided, That the entire revenue derived by the same be applied to the support and to increase the efficiency and facilities thereof, the repair and the necessary increase of grounds and buildings thereof, and for no other purpose.

(10) The sale at retail to or use by (i) any *charitable organization,* volunteer firemen's organization or nonprofit educational institution, or (ii) a religious organization for religious purposes of tangible personal property or services other than pursuant to a construction contract . . .
72 P.S. § 7204 (emphasis added).

6. The exemption for a § 501(c)(3) corporation from Pennsylvania's corporate net income tax is set forth in the definition of a "corporation" in the Tax Reform Code of 1971. It states as follows:
The [word corporation] does not include:
* * *

3. A corporation, trust, or other entity which is an exempt organization as defined by section 501 of the Internal Revenue Code of 1986 (26 U.S.C. § 501).
Section 401(1)(3) of the Tax Reform Code of 1971, 72 P.S. § 7401(1)(3).

7. Accordingly, whether the legislature uses the term "charitable organization," "501(c)(3) corporation" or "purely public charity," to identify the exempt taxpayer, the result is the same. The taxpayer must show that it is a purely public charity. To be sure, for the General Assembly to establish a constitutional tax exemption, it is limited by the standards of Article VIII, Section 2.

72 P.S. § 5020–204(a)(3) (emphasis added). In 1987, two years after the *HUP* test was announced, our Supreme Court considered whether G.D.L. Plaza was entitled to a tax exemption under the above-quoted statutory provision.

The Supreme Court found certain facts about G.D.L. Plaza's operation to be critical to the outcome. First, G.D.L. Plaza was organized as a Pennsylvania non-profit corporation for the purpose of providing housing to low-income elderly persons, who paid below-market level rents. Second, G.D.L. Plaza received assistance from HUD by way of a loan under Section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q, for construction of the facility. Under its loan agreement, G.D.L. Plaza agreed to comply with HUD guidelines with respect to admissions, rental agreements, occupancy and rental subsidies.[8] Third, G.D.L. Plaza received monthly subsidies from HUD to make up the difference between its rental income and its actual costs.

Based upon these facts, the Supreme Court came to two conclusions. First, it held that G.D.L. Plaza satisfied each of the five factors in the *HUP* test. Accordingly, G.D.L. Plaza was held to be a "purely public charity" within the meaning of Article VIII, Section 2 of the Pennsylvania Constitution. Second, it held that G.D.L. Plaza was, nevertheless, not entitled to a tax exemption because it failed the statutory test set forth in Section 204(a)(3) of the Assessment Law. It so held because G.D.L. Plaza was not "maintained by public or private charity" but, rather, by federal tax dollars. *G.D.L. Plaza II*, 515 Pa. at 64, 526 A.2d at 1178.[9]

The Supreme Court reversed this Court's holding that G.D.L. Plaza was not a purely public charity. *Council Rock School District v. G.D.L. Plaza Corp.*, 91 Pa.Cmwlth. 176, 496 A.2d 1298 (1985) (*G.D.L. Plaza I*). This Court had reasoned that the services G.D.L. Plaza provided to its residents were inadequate to satisfy the test "rendering gratuitously a substantial portion of its services." *Id.* at 1302. Further, because HUD subsidized G.D.L. Plaza's operations, this Court reasoned that G.D.L. Plaza was not "relieving the government of any of its burdens." *Id.* In reversing this Court's application of the *HUP* test, the Supreme Court acknowledged that it had been difficult for this Court to "assess in advance the relative importance of each of the factors listed in *Hospital Utilization Project.*" *G.D.L. Plaza II*, 515 Pa. at 62, 526 A.2d at 1176. However, it concluded that this Court's "advance assessment" was incorrect, explaining that this Court had placed too little weight on the services rendered by G.D.L. Plaza, *i.e.*, providing housing at below cost, and placed too much weight on the extent to which the government must be relieved of its burden.[10]

8. To be eligible, residents had to be at least 62 years of age or handicapped, and their assets could not exceed federally specified levels.

9. The holding in *G.D.L. Plaza II* is not easy to parse. The Supreme Court held that G.D.L. Plaza was a purely public charity. In other words, the Supreme Court found G.D.L. Plaza to be an "institution of charity," the words used in Section 204(a)(3) to designate a purely public charity. However, G.D.L. Plaza failed the next part of the Section 204(a)(3) test because it was not a charity "founded, endowed and maintained by public or private charity." 72 P.S. § 5020–204(a)(3). The language "founded, endowed, and maintained by public or private charity" used in Section 204(a)(3) was another way of saying a "purely public charity" prior to the *HUP* decision. *See, e.g., Appeal of Woods Schools Tax Exemption Case*, 406 Pa. at 584, 178 A.2d at 602.

The majority's holding on WRC's appeal flies in the face of the Supreme Court's holding in *G.D.L. Plaza II*. It follows the logic and reasoning used by this Court in *G.D.L. Plaza I* that was expressly rejected by the Supreme Court.[11] Residents at WRC receive housing at below cost; this, in itself, is a gratuitous service, as explained in *G.D.L. Plaza II*, 515 Pa. at 62, 526 A.2d at 1176. Further, by subsidizing WRC, the government is relieved of the burden of having to provide this housing directly. *Id.* By proving that its operations are identical to those of G.D.L. Plaza, WRC did not fail the two *HUP* test criteria as found by the trial court; to the contrary, it passed them. As a matter of *G.D.L. Plaza II's* binding precedent, WRC is a purely public charity.[12]

### Legislative Changes After *G.D.L. Plaza*

Since the decision in *G.D.L. Plaza II*, two important legislative developments have occurred. First, the General Assembly amended Section 204(a)(3) of the Assessment Law in 1992, so that it now reads as follows:

> *And provided further,* That *any charitable organization providing residential housing services* in which the charitable nonprofit organization receives subsidies for at least ninety-five per centum of the residential housing units from a low-income Federal housing program *shall remain a "purely public charity" and tax exempt* provided that any surplus from such assistance or subsidy is monitored by the appropriate governmental agency and used solely to advance common charitable purposes within the charitable organization.

Section 1(a)(3) of the Act of December 14, 1992, P.L. 886, *as amended,* 72 P.S. § 5020–204(a)(3). Second, the General Assembly enacted Act 55, which codified the "traditional legislative and judicial applications of the constitutional term 'institutions of purely public charity.' " Section 2(b) of Act 55, 10 P.S. § 372(b). The task in this appeal is to determine how each of these two legislative enactments apply to WRC's request for a tax exemption.

The 1992 amendment to Section 204(a)(3) was enacted in response to the Supreme Court's decision in *G.D.L. Plaza II*.[13] In using the phrase "*shall remain* a purely public charity," the General Assembly codified the Supreme Court's holding in *G.D.L. Plaza II* that a federally subsidized provider of low-income housing is a

---

10. If the government had to provide the same service and its costs would be higher than its subsidy, then it is relieved of some of its burden. *City of Washington v. Board of Assessment Appeals of Washington County,* 550 Pa. 175, 186, 704 A.2d 120, 125, n. 8 (1997).

11. Indeed, the majority finds that WRC failed the same two *HUP* test factors that were failed by the low-income housing provider in G.D.L. Plaza I. The Supreme Court reversed this misapplication of the *HUP* test in *G.D.L. Plaza II*.

12. The binding precedent of *G.D.L. Plaza II* defines the evidentiary burden of any other low-income housing provider taxpayer seek-

ing an exemption. Stated otherwise, the applicant has to prove the existence of the facts found dispositive in *G.D.L. Plaza II*. By showing that its operations were identical to G.D.L. Plaza's operations, WRC satisfied its burden.

13. A change in the language of a statute ordinarily indicates a change in legislative intent. *Masland v. Bachman,* 473 Pa. 280, 289, 374 A.2d 517, 521 (1977). The object of the construction of all statutes is to ascertain and effectuate the intention of the General Assembly. The clearest indication of legislative intent is generally the plain language of a statute. *See, e.g., Bowser v. Blom,* 569 Pa. 609, 617, 807 A.2d 830, 835 (2002).

purely public charity.[14] The General Assembly also matched the evidentiary burden of a federally subsidized low-income housing provider seeking a tax exemption to the holding in *G.D.L. Plaza II.* To be entitled to "remain" a purely public charity, the applicant for an exemption must show that it is non-profit and that 95% of its units are subsidized under a "low-income Federal housing program." 72 P.S. § 5020–204(a)(3).

The record made by WRC cannot be distinguished from that made by G.D.L. Plaza, and, therefore, it met the evidentiary burden required of a low-income housing provider seeking to "remain a purely public charity." 72 P.S. § 5020–204(a)(3). The only factual difference between the two cases is one that tips the balance in favor of WRC. In *G.D.L. Plaza II,* the Supreme Court reasoned that because the federal government subsidies could be increased to cover real estate taxes, G.D.L. Plaza had no risk. Here, by contrast, the record shows that WRC assumes a risk in undertaking its charitable mission. It can only draw so much in the way of federal subsidies to make up the budgetary shortfall created by inadequate rents; there is no evidence that WRC can simply get more federal funds to pay taxes.

However, to qualify for a tax exemption under Section 204(a)(3) of the Assessment Law, it is not enough for a low-income housing provider to be a purely public charity. It must also show that its "surplus or subsidy" from HUD is monitored by HUD; and that the subsidy, or the surplus it generates, is used "solely to advance [the] common charitable purposes." 72 P.S. § 5020–204(a)(3). These facts were also proved by WRC.

In sum, the only legal conclusion to be drawn from this record is that WRC is entitled to be tax exempt. First, WRC produced evidence that it was a purely public charity. It did so by demonstrating that its operations are indistinguishable from those of G.D.L. Plaza. Under the binding precedent of *G.D.L. Plaza II* and under Section 204(a)(3) of the Assessment Law, WRC is entitled to "remain a purely public charity." Second, WRC's evidence established that it satisfied the additional statutory standards in Section 204(a)(3) for a low-income housing provider seeking a tax exemption.

The next question is whether the 1992 version of Section 204(a)(3) of the Assessment Law was affected by the subsequent 1997 enactment of Act 55. I believe it was not.

The General Assembly explained that its purpose in enacting Act 55 was as follows:

> It is the intent of the General Assembly to eliminate inconsistent application of eligibility standards for charitable tax exemptions ... *by providing standards to be applied uniformly* in all proceedings throughout this Commonwealth for determining eligibility from exemption from State and local taxation *which are consistent with traditional legislative and judicial applications* of the constitutional term "institutions of purely public charity."

10 P.S. § 372(b)[15] (emphasis added). Stated otherwise, Act 55 was intended to be consistent with, *inter alia,* the holdings

---

**14.** The majority offers no explanation of what the legislature meant by the phrase "shall remain a 'purely public charity' and tax exempt...." Section 240(a)(3) of the Assessment Law, 72 P.S. § 5020–204(a)(3).

**15.** The purpose, stated in Section 2(b) of Act 55, provides in full:

> It is the intent of the General Assembly to eliminate inconsistent application of eligibility standards for charitable tax exemptions, reduce confusion and confrontation among traditionally tax-exempt institutions

of *Hospital Utilization Project* and of *G.D.L. Plaza II*, as well as with Section 204(a)(3) of the Assessment Law. To effect uniform proceedings, Act 55 established standard procedures for determining whether a taxpayer is entitled to an exemption.[16] It codified the *HUP* test, making it the legislative test for determining whether an entity is a purely public charity.[17] In the interest of a unitary scheme, Act 55 repealed all acts "inconsistent" with its terms. The statutory exemption for low-income housing providers was not included in this repeal. Section 14(b) of Act 55 states as follows:

> All other acts and parts of acts are repealed insofar as they are inconsistent with this act except for section 204(a)(3) of the act of May 22, 1933 (P.L. 853, No. 155), known as The General County As-

sessment Law, as it applies to charitable organizations providing residential housing services.

10 P.S. § 384(b).

These pertinent provisions of Act 55 lead to one conclusion: the General Assembly intended Section 204(a)(3) of the Assessment Law to remain the definitive test to apply where a low-income housing provider seeks a tax exemption.[18] Thus, low-income housing providers with operations like those of G.D.L. Plaza, or WRC, continue to have their tax exemption requests governed exclusively by Section 204(a)(3) of the Assessment Law, rather than by Act 55.[19]

### The *Community Options, Inc.* Holding

The majority asserts that in *Community Options, Inc. v. Board of Property Assess-*

and political subdivisions and ensure that charitable and public funds are not unnecessarily diverted from the public good to litigate eligibility for tax-exempt status by providing standards to be applied uniformly in all proceedings throughout this Commonwealth for determining eligibility for exemption from State and local taxation which are consistent with traditional legislative and judicial applications of the constitutional term "institutions of purely public charity."
10 P.S. § 372(b).

**16.** Section 6 of Act 55 grants an institution exempt from taxation under the Tax Reform Code of 1971 a rebuttable presumption that it meets the substantive standards for a purely public charity set forth in Section 5 of Act 55. Section 6(a)(1) states:

An institution of purely public charity that has annual program service revenue less than $10,000,000 shall be entitled to assert the presumption if the institution possesses a valid exemption under section 204(10) of the Tax Reform Code of 1971.
10 P.S. § 376(a)(1).

**17.** Section 5(a) states:

An institution of purely public charity is an institution which meets the criteria set forth in subsections (b), (c), (d), (e) and (f). An

institution which meets the criteria specified in this section shall be considered to be founded, endowed and maintained by public or private charity.
10 P.S. § 375(a). The criteria (b), (c), (d), (e) and (f) mirror the five factors that make up the *HUP* test.

**18.** However, even if Act 55 were applicable here, it would not change the outcome. WRC presented evidence sufficient to give it the benefit of the presumption that it was a purely public charity because it is a Section 501(c)(3) non-profit corporation. Because the Tax Assessment Board presented no evidence, it failed to rebut the presumption that WRC is a purely public charity under Act 55. However, this issue is not raised in this appeal.

**19.** Where the operations of the low-income housing provider are materially different from those of G.D.L. Plaza, or WRC, the taxpayer will not be able to use the binding precedent of *G.D.L. Plaza II*. In that case, the taxpayer begins with a clean slate on the question of whether it is a purely public charity, and the standards and procedures in Act 55 would be appropriately employed to evaluate the tax exemption request. Stated otherwise, a taxpayer whose operations are unlike those of G.D.L. Plaza, or WRC, may not be entitled to "remain" a purely public charity.

*ment,* 571 Pa. 672, 813 A.2d 680 (2002), (*Community Options II*) the Supreme Court held that the *HUP* test continues to apply to tax exemption requests made by those claiming to be purely public charities, notwithstanding the enactment of Act 55. This was not the holding in *Community Options II.*

In that case, the Court of Common Pleas of Allegheny County held that Act 55, not the *HUP* test, should apply to tax exemptions filed after 1998, the effective date of Act 55.[20] This Court disagreed. We disallowed the tax exemption, and in doing so reasoned that tax exemption requests should be reviewed under, first, the *HUP* test and, second, under the Act 55 procedures. *Community Options, Inc. v. Board of Property Assessment, Appeals and Review,* 764 A.2d 645 (Pa.Cmwlth.2000) (*Community Options I*). The Supreme Court reversed this Court, finding that we misapplied the *HUP* test. It held that the taxpayer was eligible for a tax exemption for all the years in question, both before and after the enactment of Act 55.

The Supreme Court did not reach the issue of whether Act 55 should replace the *HUP* test after 1998. It explained as follows:

Appellee the Borough of Churchill ... argued in its cross-appeal before the Commonwealth Court that, since Appellant did not meet the constitutional definition of "purely public charity" as set forth in the *Hospital Utilization Project* test, it was unnecessary to consider whether it met the statutory definition of "purely public charity" as outlined in [Act 55]. The Commonwealth Court agreed and reversed the trial court as to that issue. In its brief to this Court, Appellant responds by arguing that "the Commonwealth Court ignored the definition of purely public charity provided by the legislature in [Act 55] and did not give the legislature the deference to which it is entitled." Brief for Appellant at 20.

*However, we need not reach this argument* because we have rejected the Commonwealth Court's reasoning in *Community Service Foundation* and the conclusion that Appellant is not a "purely public charity" under the *Hospital Utilization Project* test.

571 Pa. at 682–683, 813 A.2d at 687 (emphasis added).[21] In short, *Community*

**20.** Act 55 codifies the substantive standards set forth in *Hospital Utilization Project.* What is new in Act 55 is the establishment of unified procedures by which to evaluate a tax exemption request that might be brought in any county. The Pennsylvania Constitution is silent on procedures, and this created the opportunity for the legislature to act. *See Collins v. Commonwealth,* 262 Pa. 572, 575, 106 A. 229, 230 (1919) (stating that "[i]f the Constitution is silent on the subject, the legislative authority, being uncontrolled, is supreme.").

Act 55 does not effect a tax exemption. It provides the roadmap for determining whether an applicant is entitled to an exemption set forth in the substantive tax statute, such as the Assessment Law or the Sales and Use Tax Statute. If all existing exemptions were re-

pealed, then Act 55 would never come into play. Act 55 complements other statutes, *i.e.,* the tax statutes creating the exemption.

**21.** The majority contends that this quoted passage refers to another issue. I disagree. In the *Community Options* litigation, the trial court held that Act 55 was the sole guide for determining, after 1998, whether an applicant for a tax exemption was a purely public charity. This Court rejected this reasoning. We held, in *Community Options I,* that, first, the *HUP* test and, second, the Act 55 test was to be applied to determine whether the appellant was a purely public charity. Appellant urged the Supreme Court to reject our Court's reasoning, but, as the above-quoted passage demonstrates, the Supreme Court did "not reach this argument" because it rejected our application of the *HUP* test.

*Options II* did not reach the issue of whether the *HUP* test trumps Act 55.[22]

Even if the majority were correct in its premise that every taxpayer seeking an exemption as a purely public charity must, first, undergo the judicially created *HUP* test, that premise is not dispositive of the question in this appeal, which is what evidence must be presented by a low-income housing provider. WRC's evidence proved that its operations were identical to those of G.D.L. Plaza, entitling it to avail itself of the Supreme Court's holding in *G.D.L. Plaza II.* Thus, the evidence WRC presented did satisfy the five-part *HUP* test and demonstrated that was a purely public charity.

I agree with the majority on the analytical paradigm to be followed in every tax exemption case. First, the applicant must prove that it is a purely public charity. Second, the applicant must prove that it satisfies any conditions set forth in the tax statute to qualify for the exemption. This was the paradigm followed in *G.D.L. Plaza II,* and it is the paradigm followed by the dissent in its analysis of WRC's application for a tax exemption.

*Community Options II* had nothing to do with federally subsidized low-income housing providers, and in no way did it limit or overrule the holding in *G.D.L. Plaza II.*

### Conclusion

This Court is required to presume the constitutionality of legislative enactments, such as Act 55 and Section 204(a)(3) of the Assessment Law, and to give them effect. *City of Philadelphia v. Commonwealth,* 575 Pa. 542, 573, 838 A.2d 566, 585 (2003). Because each enactment codifies holdings

of our Supreme Court on what constitutes a purely public charity, they cannot be unconstitutional. Nevertheless, the majority treats each enactment as a nullity, and along the way disregards the binding precedent of our Supreme Court in *G.D.L. Plaza II.*

The binding precedent of *G.D.L. Plaza II* is reason enough to reverse the trial court. For that reason alone, I would reverse and grant WRC an exemption pursuant to Section 204(a)(3) of the Assessment Law.

---

**22.** Of course, Act 55 and the *HUP* test use the same substantive standards. What is new in Act 55 is the procedure, which uses shifting burdens of proof, to apply those standards.

The result should be the same under either test, which was the outcome in *Community Options II.*